*Ann Lane v. Supervisor of Assessments of Montgomery County*, No. 41, September Term 2015

**TAXATION — STATUTORY CONSTRUCTION — MARYLAND TAX COURT — ADMISSIBILITY OF EVIDENCE —** The Maryland Tax Court may rely on sales of comparable properties occurring after the date of finality for determining the value of the subject property. The "date of finality" is a point of assessment from which tax assessors determine the value of property as of that date. Md. Code Ann., Tax-Prop. ("TP") § 8-104(b)(2). The Tax Court reviews assessments de novo and may alter the valuation to reflect the full cash value of the property. Md. Code Ann., Tax-Gen. ("TG") §§ 13-523; 13-528. The Tax Court does not violate TP § 8-104(b)(2) by considering sales of comparable properties occurring reasonably soon after the date of finality when determining the value of property on the date of finality.

**TAXATION — MARYLAND TAX COURT — ARTICLE 15 OF THE MARYLAND DECLARATION OF RIGHTS — UNIFORMITY OF ASSESSMENTS —** The Tax Court's valuation of Petitioner's property did not violate Article 15 of the Maryland Declaration of Rights, requiring uniformity of assessments, because the Tax Court assessed the value of Petitioner's property at its full cash value. The Tax Court did not violate Article 15 by relying upon evidence of sales that were not considered by the Property Tax Assessment Appeal Board for Montgomery County because the Tax Court reviews assessments de novo. TG § 13-523.

**TAXATION — MARYLAND TAX COURT — SUFFICIENCY OF THE EVIDENCE —** The Tax Court's decision was supported by sufficient evidence. The Tax Court, after considering evidence presented by both parties, discredited Petitioner's evidence and properly relied upon the Supervisor's evidence of sales of comparable properties.

Circuit Court for Montgomery County
Case No. 369661-V
Argued: January 7, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 41

September Term, 2015

ANN LANE

v.

SUPERVISOR OF ASSESSMENTS
OF MONTGOMERY COUNTY

Barbera, C.J.,
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma S. (Retired,
Specially Assigned),

JJ.

Opinion by Barbera, C.J.
Battaglia and Watts, JJ., dissent.

Filed: May 3, 2016

*Battaglia, J., now retired, participated in the hearing and conference of the case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Maryland law requires that, unless exempted, all real property in the State be assessed for property tax purposes. The assessment is calculated by reference to the value on the "date of finality," which is defined as "January 1, immediately before the 1st taxable year to which the assessment based on the new value is applicable." Md. Code Ann., Tax-Prop. ("TP") § 8-104(b)(1) (2009, 2012 Repl. Vol.). This case presents the question of whether the Tax Property Article prohibits the Maryland Tax Court from taking into account sales of comparable properties that occur *after* the date of finality in determining the value of a property *on* the date of finality.

The Tax Court did not believe itself so constrained and, as we shall see, valued the property by relying on sales of comparable properties that occurred several months after the date of finality. The Court of Special Appeals found no error with the Tax Court's reliance on that evidence and neither do we.

I.

*Real Property Taxation in Maryland*

"Unless otherwise exempted by statute, all property located in the State is subject to assessment and property tax and is taxable to the owner of the property." *State Dep't of Assessments & Taxation v. Andrecs*, 444 Md. 585, 590 (2015). "Calculation of a property assessment begins with a determination of the property's value[,]" and, in accordance with the dictates of Article 15 of the Maryland Declaration of Rights, the rules for such calculation must be "uniform."[1] *Id.* at 591; *see also* 589-90 (discussing same).

_____

[1] Article 15 of the Maryland Declaration of Rights provides:
    That the levying of taxes by the poll is grievous and oppressive and ought to

The value of real property is determined by the State Department of Taxation and Assessment or its local Supervisor of Assessments "once in every 3-year cycle based on an exterior physical inspection of the real property." TP § 8-104(b)(1). "[T]he value of the real property shall be its value on the date of finality," TP § 8-102(a), and, for purposes of real property assessed under TP § 8-104(b)(1), the "date of finality" is the "January 1 immediately before the 1st taxable year to which the assessment based on the new value is applicable," TP § 8-104(b)(2). *See also* TP § 1-101(oo) (explaining that the taxable year begins on July 1).

The Tax Property Article does not prescribe a specific methodology for valuation. Respondent Supervisor of Assessments of Montgomery County ("Supervisor") advises us that, since 1992, the State Department of Assessments and Taxation and its local assessors have followed the practice of considering sales after the date of finality to value property as of the date of finality when those sales are reasonably close in time and otherwise comparable to the subject property.

II.

be prohibited; that paupers ought not to be assessed for the support of the government; that the General Assembly shall, by uniform rules, provide for the separate assessment, classification and sub-classification of land, improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy; yet fines, duties or taxes may properly and justly be imposed, or laid with a political view for the good government and benefit of the community.

The case before us has its genesis in Petitioner Ann Lane's appeal of her 2011 tax assessment of the condominium she owns and occupies in Parc Somerset, a seventeen-story building located on Wisconsin Avenue in Chevy Chase, Maryland. Parc Somerset is the newest of three condominium buildings, all of which were built over a twenty-year period and together comprise the Somerset House development. Condominiums in Parc Somerset are the most desirable in the development. Certain condominiums in Parc Somerset that are located directly above and below one another form a "stack," meaning that the units are exactly the same in design, layout, and size. Petitioner's unit is located on the tenth floor in the "03" stack. The "03" stack runs from floors three to twelve and each of the "03" units measures 2,498 square feet.[2]

On December 28, 2010, the Supervisor notified Petitioner that her condominium ("unit 1003"), would be assessed at a value of $2,130,000, representing "the new market value effective January 1, 2011." The Notice stated that the "new market value is based upon market data available prior to this date." The assessment, which was determined by using a computer-assisted mass appraisal technique, was approximately 11 percent higher than the previous assessment of Petitioner's property.

Petitioner, believing the assessment to be incorrect, availed herself of her administrative rights of appeal. She appealed first to the Supervisor, who issued a Final

---

[2] The units on the floors below and above the "03" stack are not part of the stack because those units differ in layout and size.

3

Notice of Assessment in August 2011, making no change to the assessment. Petitioner appealed that decision to the Property Tax Assessment Appeal Board for Montgomery County ("PTAAB"). At that juncture, Petitioner's appeal was consolidated with those of nine other Parc Somerset condominium owners, including the owners of units 803 and 703. The PTAAB reduced the assessment for unit 803 to $1,840,000 and the assessment for unit 703 to $1,830,000 but left standing the assessment of Petitioner's property.[3]

Petitioner appealed the decision of the PTAAB to the Maryland Tax Court. She presented two arguments in support of a reduction in the assessed value of her condominium. She argued first that the correct value of her condominium was $1,649,000 plus a $20,000 floor premium for a total value of $1,669,000. In support of that value, Petitioner relied on two items of evidence: the affidavit of a real estate broker attesting to a $10,000 floor premium for units in Parc Somerset; and an appraisal of unit 803, which valued that condominium at $1,649,000 as of January 3, 2011, and was conducted on behalf of a mortgage company to assist the owners of unit 803 in refinancing their mortgage. Petitioner alternatively argued that, because the PTAAB had valued unit 703 at $1,830,000 and unit 803 at $1,840,000, her property should be valued, at the most, at $1,860,000,

---

[3] Petitioner states in her brief that the PTAAB "specifically rejected" post-January 1, 2011, sales of comparable units in Parc Somerset as evidence of the value of the subject condominiums on that date. The record of the hearing before the PTAAB is not before us, nor is it necessary that it be before us because, as the Tax General Article provides, the subsequent appeal to the Tax Court was de novo. Md. Code Ann., Tax-Gen. § 13-523 (1988, 2010 Repl. Vol.). The record before the Tax Court includes the written decisions of the PTAAB reflecting that it reduced the assessments of units 803 and 703. The record before the Tax Court does not reflect what became of the appeals of the remaining seven condominium owners whose appeals were consolidated with that of Petitioner, before the PTAAB.

4

accounting for a $10,000 premium that the PTAAB appeared to have accorded to each additional floor.

Leonard Nichols, a real estate appraiser and hearing specialist, was present at the hearing on behalf of the Supervisor and was accepted by the Tax Court as an expert witness. Mr. Nichols informed the Tax Court that, in his view, the value of Petitioner's property was $2,130,000. Mr. Nichols testified that he arrived at that valuation by reliance on the sales of three comparable condominium units in Parc Somerset. All of those units measured 2,441 square feet and were sold in May 2011.[4] When comparing these sales to unit 1003, Mr. Nichols made adjustments for variations between the subject property and comparable properties.

The first comparable sale was of unit 207, which sold for $2,200,000; to that amount Mr. Nichols added $35,000 for the difference in square footage, $80,000 as a floor premium,[5] and $15,000 for land adjustments. Based on that information, Mr. Nichols concluded that the market value for unit 1003 was $2,330,000.

The second comparable sale upon which Mr. Nichols relied was of unit 507, which sold for $2,075,000; to that amount he added $35,000 for the difference in square footage,

---

[4] The record is not entirely clear about the dates on which the three properties were sold. Mr. Nichols testified that each of the three condominiums "sold" on a specific date in May 2011; he later clarified his testimony to say that the three dates he mentioned in connection with the sales were the dates on which the sales were recorded. We shall operate here under the assumption that the sales in fact occurred in May 2011, as both Petitioner and the Supervisor state as much in their briefs before us.

[5] Both parties accorded a $10,000 per floor premium to the units in Parc Somerset and, as reflected by its ultimate valuation of Petitioner's unit, so too did the Tax Court.

$50,000 as a floor premium, and $15,000 for land adjustments. Based on that information, Mr. Nichols concluded that the market value for unit 1003 was $2,175,000.

The third comparable sale was of unit 707 which sold for $1,995,000; Mr. Nichols added $35,000 for the difference in square footage, $30,000 as a floor premium, and $15,000 for land adjustments. Based on this third comparable unit, Mr. Nichols valued unit 1003 at $2,075,000.

Mr. Nichols further testified that no sales of units in Parc Somerset occurred during 2010. He added that he had chosen not to rely upon sales from the other two buildings in the Somerset House development because those units were in older, less desirable buildings and therefore were not comparable to units in Parc Somerset.

Petitioner objected to Mr. Nichols's testimony, arguing that the sales were not of comparable units and, even so, occurred more than four months after January 1, 2011, the "date of finality." In the discussion that followed, Mr. Nichols noted that the common practice at the Tax Court is to submit sales occurring within the first half of the year after the date of finality and that he excluded comparable properties sold in September and December of 2011 as "too far beyond the date of finality." The court overruled Petitioner's objection, stating that it is the "policy" of the Tax Court to accept evidence of sales occurring shortly after the date of finality, "[e]specially when there's nothing else, when there are no other sales."

The Tax Court considered both parties' evidence concerning comparable units. The Tax Court decided that the Supervisor's evidence offered through Mr. Nichols provided a more accurate measure than that offered by Petitioner in determining the value of

6

Petitioner's condominium as of January 1, 2011. The Tax Court found that unit 707 was the "best indicator of [the] value" of Petitioner's property and agreed with Mr. Nichols's adjustments in comparing unit 707 to unit 1003. The Tax Court reasoned that Petitioner's evidence concerning the January 3, 2011, refinancing appraisal of unit 803 was a less accurate indicator of the value of Petitioner's unit, given a lending bank's interest in seeking a low appraisal. The Tax Court further noted that the appraisal of unit 803 was based upon sales from the two older buildings in the Somerset House development and had not included appropriate adjustments for unit 803, based on its location in the newer, more desirable Parc Somerset building. Evidently relying most heavily upon the Supervisor's third comparable sale, the Tax Court reduced the assessment of Petitioner's property from $2,130,000 to $2,075,000.

Petitioner filed a petition for judicial review in the Circuit Court for Montgomery County. After hearing from the parties, the Circuit Court ruled that the Tax Court had committed legal error in considering the Supervisor's evidence of the post-"date of finality" sales of units in Parc Somerset and, consequently, the decision of the Tax Court was arbitrary and capricious. The Circuit Court ordered a remand to the Tax Court for the assessment to be reconsidered and "reduce[d]."

The Supervisor appealed to the Court of Special Appeals, which reversed the judgment of the Circuit Court and affirmed the Tax Court's decision. *Supervisor of Assessments of Montgomery Cty. v. Lane*, 222 Md. App. 107 (2015). We granted Petitioner's petition for a writ of certiorari to consider the following questions:

1. Whether evidence of sales consummated subsequent to the date of finality is

7

admissible in property tax assessment cases?

2. Does the record lack substantial evidence to support the Tax Court's determination of assessed value where the Tax Court relied solely upon post-date of finality sales of units that differ from the subject property in location, layout, and size, and effectively imposed a $290,000 premium over the assessed value determined by the Property Tax Assessment Appeals Board for Montgomery County for an identical unit two floors below?

We answer yes to the first question and no to the second question. We therefore affirm the judgment of the Court of Special Appeals.

## III.

"An appeal before the Tax Court shall be heard *de novo* and conducted in a manner similar to a proceeding in a court of general jurisdiction sitting without a jury." Md. Code Ann., Tax-Gen. ("TG") § 13-523 (1988, 2010 Repl. Vol.). Though denominated a "court," the Tax Court is an administrative agency and, as such, "is subject to the same standards of judicial review as other administrative agencies." *Frey v. Comptroller of Treasury*, 422 Md. 111, 136 (2011). We look through the decisions of the Circuit Court and the Court of Special Appeals to review the decision of the agency directly. *Comptroller of the Treasury v. Science Applications Int'l Corp.*, 405 Md. 185, 192 (2008). We affirm the decision of the Tax Court "unless that decision is not supported by substantial evidence appearing in the record or is erroneous as a matter of law." *Supervisor of Assessments v. Stellar GT*, 406 Md. 658, 669 (2008). This Court accords great deference to "the Tax Court's interpretation of the tax laws, but reviews its application of case law without special deference." *Andrecs*, 444 Md. at 604.

## IV.

8

Petitioner claims that the Tax Court erred as a matter of law in relying upon evidence of sales of comparable units in Parc Somerset that post-dated January 1, 2011. She interprets TP § 8-104(b)(2) as prohibiting the Tax Court from considering any evidence arising after the date of finality when assessing property as of that date. She makes two arguments in support of that position: (1) the plain language of TP § 8-104(b)(2) precludes the Tax Court's consideration of comparable sales occurring after January 1, 2011; and (2) consideration of such evidence violates the "uniformity" requirement of Article 15 of the Declaration of Rights. The Supervisor counters that the statutory language does not indicate, one way or the other, how property must be valued as of the date of finality; consequently, the Tax Court may consider probative evidence when assessing the value of the subject property as of January 1, 2011, including evidence of sales of comparable properties occurring reasonably soon after the date of finality. The Supervisor adds that relying on such evidence does not run afoul of Article 15. We conclude that the Supervisor has the better part of the argument.

(a)

Petitioner's first argument is one of statutory interpretation. Her argument for why the "plain language" of TP § 8-104(b)(2) does not allow for consideration of post-"date of finality" sales of comparable units rests on the definition of "finality." Petitioner quotes Merriam-Webster's definition of "finality" as possessing "the character or condition of being final, settled, irrevocable, or complete." She argues, based on that definition, that TP § 8-104(b)(2) precludes reliance upon evidence of sales occurring after the date of finality when assessing the value of property on that date. Petitioner maintains that

9

interpreting TP § 8-104(b)(2) to allow reliance on sales occurring within "a reasonable period of time thereafter" would permit the vagaries of individual decision-makers to determine what constitutes "a reasonable period of time." Petitioner argues that a "bright-line rule that [TP §] 8-104 prohibits the use of sales occurring after the date of finality is consistent with the principle that '[i]n case of doubt, tax statutes are construed most strongly against the government, and in favor of the citizen.'" (Quoting *Comptroller of Treasury v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 484 (2003)).

We agree with Petitioner that the meaning of the phrase "date of finality" is that real property is to be assessed by reference to its value on January 1 of the relevant tax year. This meaning is fully consistent, moreover, with other provisions of the Tax Property Article. We, however, do not agree with Petitioner that the plain meaning of that phrase forecloses consideration of evidence that is relevant to determining the value of a subject property on the date of finality. Indeed, neither TP § 8-104 nor, as far as we can discern, any other provision of Title 8 of the Tax Property Article prescribes *how* the property's value, on the date of finality, is to be calculated.

Whenever confronted with a question of statutory interpretation, we turn to the well-settled rules for that process. Those rules require us to ascertain the intent of the General Assembly. *Green v. Church of Jesus Christ of Latter-Day Saints*, 430 Md. 119, 135 (2013). We give the words their "natural and ordinary meaning." *Montgomery County v. Phillips*, 445 Md. 55, 62 (2015) (internal quotation marks omitted). We avoid construing words in insolation; rather, we analyze the text within the larger statutory scheme in which it belongs. *Frey*, 422 Md. at 182. And, "[w]e neither add nor delete words to a clear and

10

unambiguous statute to give it a meaning not reflected by the words the [General Assembly] used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Phillips*, 445 Md. at 62 (alterations in original) (internal quotation marks omitted).

The statutory scheme of the Tax Property Article reflects the General Assembly's intent to have the "full cash value" of the subject real property be assessed as of the date of finality.[6] "Full cash value" is the equivalent of fair market value. *See Shell Oil Co. v. Supervisor of Assessments of Prince George's Cty.*, 278 Md. 659, 667-69 (1976). The fair market value of the property is the value "a willing purchaser would pay to a willing seller in the open market." *Weil v. Supervisor of Assessments of Washington Cty.*, 266 Md. 238, 246 (1972) (internal quotation marks omitted). "Thus, for purposes of measuring full cash value, the assessor should assume that a willing buyer and a willing seller wish to engage in a hypothetical sale of the property to be assessed." *St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert Cty.*, 307 Md. 441, 446 (1986).

Sales of comparable properties occurring reasonably soon after the date of finality are relevant to an accurate assessment of the valuation of property as of that date; there is, therefore, no good reason why such probative evidence should not be considered. *See Supervisor of Assessments of Anne Arundel Cty. v. Southgate Harbor*, 279 Md. 586, 593

---

[6] *See* TP § 1-101(qq) (defining "value" as "full cash value"); TP § 8-102(a) ("[T]he value of real property shall be its value on the date of finality."); TP § 8-104(b)(2) (providing that the "date of finality" is "January 1 immediately before the 1st taxable year to which the assessment based on the new value is applicable); *see also State Dep't of Assessments & Taxation v. Andrecs*, 444 Md. 585, 591 (2015) ("Calculation of a property assessment begins with a determination of the property's value.").

11

(1977) ("Because valuation is not an exact science many, many methods have been used in attempting to determine fair market value."); *State Dep't of Assessments & Taxation v. Greyhound Comput. Co.*, 271 Md. 575, 591 (1974) ("It has long been established that assessors have reasonable latitude in selecting any proper method of valuation that results in assessment at full cash value."). Moreover, nothing in the Tax Property Article, the legislative history of TP § 8-104(b)(2), or cases construing it suggests a contrary conclusion.

We pointed out earlier in this opinion that the Tax Court reviews the appeal "de novo" and conducts the hearing "similar to a proceeding in a court of general jurisdiction sitting without a jury." TG § 13-523. The Tax Court has the "full power to hear, try, determine, or remand any matter" and, "[i]n exercising these powers, the Tax Court may reassess or reclassify, abate, modify, change or alter any valuation[.]" TG § 13-528. Inherent in those powers is the discretion to decide what evidence is relevant to the matter at issue and accord to that evidence the weight it deserves. *See* TG § 13-524 ("The Tax Court is not bound by the technical rules of evidence.").

Because valuation "is not an exact science," we have held that "assessors have reasonable latitude in selecting a method of valuation that arrives at full cash value." *St. Leonard Shores Joint Venture*, 307 Md. at 448. The Tax Court, as the determiner of the value of Petitioner's condominium, had the responsibility to decide the relevance of the evidence presented, discard that which the court deemed irrelevant, and accord to that which is relevant the weight it deserved. The Tax Court considered as most relevant to assessing the value of Petitioner's unit the three sales of other units in Parc Somerset, all

12

of which were sold in May 2011.

In *Hance v. State Roads Commission of Maryland*, 221 Md. 164, 170-71 (1959), we reviewed the admissibility of evidence to determine the fair market value of property condemned by eminent domain, as of March 4, 1959, the date of the government condemnation. The trial court had excluded evidence of a comparable property sold a few weeks after the taking, "apparently on the sole ground that this sale was made *subsequent* to the taking." *Id.* at 173. We held that evidence of that sale should have been admitted because such evidence is relevant to determining the market value of the property as of the date of the taking. *Id.* at 175-76.

Petitioner argues that *Hance* is distinguishable because a condemnation proceeding does not have a "date of finality" similar to an assessment proceeding. We conclude, however, that a court in a condemnation proceeding, such as in *Hance*, is similar to an assessment proceeding before the Tax Court because both courts are assessing the value of property as of a certain date. Indeed, this is not the first tax assessment case in which a condemnation case has guided our analysis. *See Shell Oil Co.*, 278 Md. at 665-68 ("Current zoning was an entirely proper factor for the assessor to consider in reaching his determination as to fair market value just as this is a proper factor to be considered in an eminent domain proceeding."). *Hance* confirms that evidence of sales of comparable properties occurring after an assessment date may be relevant to the property's fair market value as of the date of assessment and therefore are admissible.

The conclusion we reach here is in line with that of our sister state courts, which have admitted evidence of comparable property sales occurring after the tax assessment

13

date.  *See In re Application of Rosewell*, 458 N.E.2d 121, 125-26 (Ill. App. Ct. 1983) (holding that evidence occurring after the tax assessment date, including the "sale of property during the tax year in question[,] is a 'relevant factor' in considering the validity of an assessment"); *Almax Builders, Inc. v. City of Perth Amboy*, 1 N.J. Tax 31, 37-38 (N.J. Tax Ct. 1980) (holding that a sale of property after the tax assessment date is admissible "[s]o long as a proffered sale is not remote" because "[o]ne cannot deny the logic of the equal rational probative value of a sale which occurs one day after the assessment date compared to its occurrence one day prior to such date" and any "weight to be accorded such sale or sales [remains with] the factfinder"); *People ex rel. Four Park Ave. Corp. v. Lilly*, 37 N.Y.S.2d 733, 737 (N.Y. App. Div. 1942) (concluding that "[e]vidence of a sale though made after the taxable status date is admissible at the hearing before the court even though it could not have been before the tax assessors" because such evidence is "indicative of [the property's] full value"); *Sabin v. Dep't of Revenue*, 528 P.2d 69, 71 (Or. 1974) (concluding that "[a] sale of the property within a reasonable time of the assessment while not conclusive, is very persuasive of market value[,]" applying "equally to transactions in the assessed property before and after the valuation date").

Petitioner argues that consideration of sales that occur after the date of finality constitutes a retroactive assessment.  For that argument, she points to *Montgomery County Board of Realtors, Inc. v. Montgomery County*, 287 Md. 101 (1980), and *Supervisor of Assessments v. Stellar GT*, 406 Md. 658 (2008).  Neither case supports Petitioner's argument.

In *Montgomery County Board of Realtors*, the County imposed a tax on "the transfer

14

of real property" when the "taxable value of such property on the date of [conveyance] exceeds the assessed valuation of that property." 287 Md. at 103. The ordinance was intended to prevent the owner/seller of property from "enjoy[ing] the use of the property at a lesser tax burden than the sale reveals he should have borne." *Id.* at 102. We invalidated the County's attempt to "reassess and tax real property after the date of finality," as it would "move forward the date of finality" and thereby directly conflict with state law. *Id.* at 109-10. *Montgomery County Board of Realtors* does not address, much less decide, what evidence the Tax Court may consider when assessing the value of property as of the date of finality.

*Stellar GT* likewise is of no assistance to Petitioner. That case involved the Supervisor of Assessments' reassessment of a property upon its sale for a price that far exceeded the assessment that had been determined on the date of finality at the outset of the tax cycle. We recognized that TP § 8-104(c)(1) permits mid-cycle reassessments under certain circumstances. We held, though, that the sale of the subject property is not one of those circumstances, 406 Md. at 662, 673; consequently, the reassessment, based on the sale price, amounted to a retroactive assessment, *id.* at 675. That case is not remotely like the case before us. The Tax Court's exercise of its legislative grant of authority to assess de novo the value of a subject property on the date of finality does not amount to a retroactive assessment.[7] For the reasons we have discussed, we reject Petitioner's

---

[7] Petitioner also argued during oral argument before us that a taxpayer's right to appeal may be chilled if post-"date of finality" sales may be admitted because those sales may support a greater assessment than originally assessed by the tax assessor. Our decision in *Abramson v. Montgomery County*, 328 Md. 721 (1992), demonstrates the flaw in

15

construction of TP § 8-104(b)(2), and we hold that sales of comparable properties occurring reasonably soon after the date of finality can be considered relevant by the Tax Court when called upon to assess the value of the property on the date of finality.

(b)

We turn next to Petitioner's argument that admitting sales evidence subsequent to the date of finality violates the uniformity requirement of Article 15. The assessment of property taxes must "be 'uniform' within each class or sub-class of property as those classes are defined by the Legislature"; therefore, property must be "assessed based on an equivalent proportion of the property's actual value." *Andrecs*, 444 Md. at 589. Judge McDonald, writing for this Court in *Andrecs*, explained that there are two principles attendant to the requirement of uniformity: "(1) that property taxes be based on actual value and (2) that they be assessed based on an equivalent proportion of value within each class or sub-class of property." *Id.* Perfect uniformity in assessments is an impossibility and therefore not required. *Id.* at 590.

Petitioner asserts that the Tax Court violated Article 15 by considering evidence that

---

Petitioner's argument. In *Abramson*, the property owners of White Flint Mall, unhappy with the Supervisor's valuation of their property, took an appeal to the PTAAB. At the hearing before the PTAAB, Montgomery County intervened and argued that the property value was higher than that proposed by the Supervisor, but PTAAB affirmed the Supervisor's valuation. *Id.* at 725. Montgomery County appealed PTAAB's decision to the Tax Court, and the Tax Court, agreeing with the County's valuation, increased the property's value for tax assessment. *Id.* at 725-26. The owners appealed the Tax Court's decision, arguing that Montgomery County lacked standing before the Tax Court. *Id.* at 726. We rejected the argument and held that, pursuant to TP § 14-512, "Montgomery County could appeal to the Tax Court seeking an increase in [the owners'] property tax assessment." *Id.* at 723, 739.

differed from that which the PTAAB considered. We disagree. The Tax Court, as the de novo arbiter of the value of Petitioner's condominium, was entitled to consider whatever evidence that, within reason, the court deemed relevant.

Petitioner also argues that the Tax Court violated the uniformity requirement of Article 15 because the Tax Court failed to assess her property consistent with the PTAAB's assessments of virtually identical units, 803 and 703. The uniformity requirement is violated when property within the same class or sub-class is not "assessed based on an equivalent proportion of the property's actual value." *Andrecs*, 444 Md. at 589. Accordingly, Article 15 "requires that the same standard of value or economic yardstick must be used in making assessments within the same subclass." *Greyhound*, 271 Md. at 590. In the present case, the Tax Court's valuation of Petitioner's property does not offend uniformity principles because her property was assessed at its full cash value, which is the "economic yardstick" used to assess all real property. *See id.*; *see also Samet v. Supervisor of Assessments of Balt. City*, 290 Md. 357, 361 (1981) (explaining that an owner whose property has been properly assessed according to the fair market value will not receive a reduced assessment even when neighboring properties may have been assessed at a lesser valuation). We hold that the Tax Court did not violate Article 15.

V.

When reviewing whether the Tax Court's decision is supported by substantial evidence, we evaluate "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Frey*, 422 Md. at 137 (internal quotation marks omitted). The Tax Court resolves conflicts in evidence and draws reasonable inferences

17

when necessary. *St. Leonard Shores Joint Venture*, 307 Md. at 447. Petitioner argues that the Tax Court's decision is not supported by substantial evidence because the court relied solely upon post-date of finality sales and consequently failed to consider Petitioner's evidence. We disagree.

The Tax Court considered but discredited Petitioner's evidence—an appraisal, for refinancing purposes, of a unit in Park Somerset that was based on units in the older, less desirable buildings in the Somerset House development. The Tax Court explained at the hearing that, "even though the methodology of the appraisal" was professional, "it's not accurate at all." The Tax Court reasoned that when Petitioner's appraiser relied on "sales from the other building[s]," the appraiser failed to make appropriate adjustments to account for the desirability of the Parc Somerset building. The Tax Court concluded that the Supervisor's evidence was more accurate to the valuation of Petitioner's property. In its written decision, the Tax Court again summarized the evidence presented by both parties and concluded that "based on the Assessor's best comparable, a modicum of further relief is warranted" thereby, again, crediting the Supervisor's evidence as more probative of the valuation.

We held earlier in this opinion that the Tax Court may consider the sale of comparable properties occurring within a reasonable time after the date of finality to assess the value of the property. As was its prerogative, the Tax Court relied in the present case on such evidence to support its assessment. We see no error of fact or law in the Tax Court's doing so and therefore defer to that court's decision. *See Supervisor of Assessments of Anne Arundel Cty. v. Hartge Yacht Yard, Inc.*, 379 Md. 452, 461 (2004) (explaining that,

18

when "the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision"). We therefore hold that the Tax Court's assessment of Petitioner's property, relying upon the Supervisor's post-date of finality sales, was supported by substantial evidence in the record.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Montgomery County
Case No. 369661-V

Argued: January 7, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 41

September Term, 2015

_____

ANN LANE

v.

SUPERVISOR OF ASSESSMENTS OF
MONTGOMERY COUNTY

_____

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma S. (Retired, Specially
Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which
Battaglia, J., joins

_____

Filed: May 3, 2016

*Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I dissent. Although the Majority opinion is well written, I would hold that Md. Code Ann., Tax-Prop. (1985, 2012 Repl. Vol.) ("TP") § 8-104(b), by its plain language, does not permit the Maryland Tax Court ("the Tax Court") to take into consideration sales of comparable properties that occur after the date of finality in determining the value of a property on the date of finality.

Because this case turns on statutory interpretation, I reiterate the pertinent principles of statutory interpretation as set forth in Hailes v. State, 442 Md. 488, 495-96, 113 A.3d 608, 612 (2015):

> In interpreting a statute, a court first considers the statute's language, which the court applies where the statute's language is unambiguous and clearly consistent with the statute's apparent purpose. Where the statute's language is ambiguous or not clearly consistent with the statute's apparent purpose, the court searches for the General Assembly's intent in other indicia, including the history of the statute or other relevant sources intrinsic and extrinsic to the legislative process, in light of: (1) the structure of the statute; (2) how the statute relates to other laws; (3) the statute's general purpose; and (4) the relative rationality and legal effect of various competing constructions.

(Citations, internal quotation marks, and brackets omitted).

Examining the plain language of TP § 8-104(b), I would conclude that nothing in TP § 8-104(b) permits the Tax Court to take into consideration events occurring after the date of finality in determining the value of a property on the date of finality. TP § 8-104(b)(1) provides that, "[n]otwithstanding a revaluation under subsection (c) of this section, the [State] Department [of Assessments and Taxation ("SDAT")] or supervisor [of assessments for a county] shall value all real property once in every 3-year cycle based on an exterior physical inspection of the real property." TP § 8-102(a) provides that, with an

exception not relevant here, "the value of real property **shall be its value on the date of finality**." (Emphasis added). TP § 8-104(b)(2), in turn, states: "The date of finality for real property that is valued under this subsection is the January 1 immediately before the 1st taxable year[1] to which the assessment based on the new value is applicable." In other words, pursuant to TP § 8-102(a), the value of a property "shall be its value on the date of finality[,]" which, under TP § 8-104(b)(2), is January 1 of the relevant tax year. Significantly, TP § 8-104(b)(2) makes no mention whatsoever of consideration of events occurring after the date of finality as being relevant to determining the value of a property on the date of finality. Rather, the date of finality is the date of finality—*i.e.*, January 1 of the relevant tax year—nothing more and nothing less.

TP § 8-104(b)(2)'s plain language comports with the commonsense understanding of the term "finality." Black's Law Dictionary defines "finality" as "[t]he quality of being complete and unchangeable." Finality, Black's Law Dictionary (10th ed. 2014). Similarly, Merriam-Webster defines "finality" as "the quality or state of being final or finished and not able to be changed" and as "the character or condition of being final, settled, irrevocable, or complete[.]" Finality, Merriam-Webster (2015), http://www.merriam-webster.com/dictionary/finality [http://perma.cc/3V8H-MYD7]. Simply put, something has finality when it is complete, final, and finished. Thus, the date of finality for purposes of real property assessment is January 1 of the relevant tax year; *i.e.*, that is the date when

---

[1]TP § 1-101(oo) defines "taxable year" as "July 1 to June 30, both inclusive, for which the State, each county, municipal corporation, and taxing district of the State computes, imposes, and collects property tax."

the assessment is to be complete, final, and finished, and the value of a property must be the value that exists on January 1.

TP § 8-104(b)(2)'s plain language and meaning simply does not allow for consideration of events occurring after January 1 for a determination of what a property's value is as of January 1. And this reading of TP § 8-104(b)(2) is entirely logical. If something is to be final as of a certain date, that does not mean that something is somewhat final as of that date and that events that occur months after that date can somehow be used to justify a different result or to change what otherwise is meant to be final. Take, for instance, the example of a student's homework assignment. The teacher states that the homework assignment must be finished as of January 1 and that her grade will be finalized as of that same date, January 1. The student finishes the homework assignment and turns it in on January 1. The teacher grades the homework assignment and returns it to the student. The student believes that the homework assignment grade is final and thinks no more of it. Months later, however, after having graded other assignments from other students, the teacher adjusts the grade given to the student on the homework assignment due on January 1, lowering the grade. Obviously, the student thinks such a result is unfair because the grade given after she turned in the homework assignment has now been adjusted against her, based on events that occurred after that assignment, namely, other students having turned in other assignments. Such a result flies in the face of the ordinary meaning of the term "final."

Moreover, in addition to the circumstance that TP § 8-104(b)(2)'s plain language and meaning do not provide for consideration of events occurring after January 1 in

determining what a property's value is as of January 1, TP § 8-104(b)(2)'s legislative history is notably silent on the matter. Indeed, the Majority fails to identify any legislative history supporting its interpretation of TP § 8-104(b)(2). Rather, the Majority simply states: "Sales of comparable properties occurring reasonably soon after the date of finality are relevant to an accurate assessment of the valuation of property as of that date; there is, therefore, no good reason why such probative evidence should not be considered." Maj. Slip Op. at 11 (citations omitted).[2] But such reasoning is circular, renders the term "date of finality" essentially meaningless, and adds to TP § 8-104(b)(2) language that is not there, thus violating one of the cardinal rules of statutory construction. See Montgomery Cnty. v. Phillips, 445 Md. 55, 62, 124 A.3d 188, 192 (2015) ("[W]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words [that] the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." (Citation and brackets omitted)); id. at 63, 124 A.3d at 192 ("In construing a statute, we avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." (Citation and brackets omitted)); Doe v. Montgomery Cnty. Bd. of Elections, 406 Md. 697, 712, 962 A.2d 342, 351 (2008) ("We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence[,] or phrase is rendered surplusage, superfluous, meaningless[,] or nugatory." (Citations and internal

___

[2]The Majority also relies on jurisprudence from the 1940s, 1970s, and 1980s, from other jurisdictions. See Maj. Slip Op. at 13-14. The age and sparsity of the case law alone from the other jurisdictions calls into question its persuasiveness in interpreting the Maryland statute, TP § 8-104(b)(2).

quotation marks omitted)).  In short, in my view, the Majority adds something to TP § 8-104(b)(2) that is not there where the General Assembly has given no indication that it intended to permit the Tax Court to consider events occurring after the date of finality in determining a property's value on the date of finality.  And there is a good reason for not considering sales occurring after the date of finality—namely, fairness to the taxpayer.

The Majority also holds that, because the Tax Court reviews appeals *de novo*, the Tax Court "had the responsibility to decide the relevance of the evidence presented, discard that which the court deemed irrelevant, and accord to that which is relevant the weight [that] it deserved"; *i.e.*, the Tax Court was permitted to consider the sales of comparable properties occurring after the date of finality.  Maj. Slip Op. at 12.  However, such a holding turns the concept of *de novo* review on its head.  To be sure, "[a]n appeal before the Tax Court shall be heard de novo and conducted in a manner similar to a proceeding in a court of general jurisdiction sitting without a jury."  Md. Code Ann., Tax-Gen. (1988, 2010 Repl. Vol.) § 13-523.  However, the power of the Tax Court to hear appeals *de novo* does not permit the Tax Court to override the plain language of TP § 8-104(b)(2) and take into consideration evidence that occurs after the date of finality in contravention of TP § 8-104(b)(2).  Indeed, the Majority's reasoning as to the Tax Court's power to hear appeals *de novo* is a red herring and has no correlation whatsoever with the Tax Court's authority as it relates to statutory interpretation.  See, e.g., Phillips, 445 Md. at 61-62, 124 A.3d at 191-92 (When an appellate court reviews decisions of the Tax Court, the appellate court is "under no statutory constraints in reversing a Tax Court order [that] is premised solely upon an erroneous conclusion of law. . . . A reviewing court will not accord deference to

the [T]ax [C]ourt's decision on a question of law[.]"  (Citations and internal quotation marks omitted)).

Furthermore, I disagree with the Majority's use of condemnation cases to justify exceeding the plain language of TP § 8-104(b)(2).  Specifically, I disagree with the Majority's reading of Hance v. State Rds. Comm'n of Md., 221 Md. 164, 156 A.2d 644 (1959) as "confirm[ing] that evidence of sales of comparable properties occurring after an assessment date may be relevant to the property's fair market value as of the date of assessment and therefore are admissible."  Maj. Slip Op. at 13.  In my view, Hance, 221 Md. at 167, 156 A.2d at 644, is distinguishable and not persuasive in the context of this property assessment case because, simply put, it is a condemnation case.  In Hance, id. at 175, 156 A.2d at 650, we held that, in the context of a condemnation case, comparable sales that "tak[e] place subsequent to the taking" may be considered in determining the market value of the property as of the date of the taking.  That the most recent information about the values of comparable properties is admissible in condemnation cases is not dispositive of the issue in this case.

Importantly, the statutes concerning eminent domain do not provide that the valuation of the property taken must be done by the date of finality.  Indeed, Md. Code Ann., Real Prop. (1974, 2015 Repl. Vol.) § 12-103 expressly provides: "Unless an applicable statute specifies a different time as of which the value is to be determined, the value of the property sought to be condemned and of any adjacent property of the defendant claimed to be affected by the taking shall be determined as of the date of the taking, if taking has occurred, or as of the date of trial, if taking has not occurred."  Nonetheless, this

Court has held that the "valuation date is not immutable" "because the date of valuation set by statute cannot be used to deprive a property owner of the just compensation [that the owner] is entitled to receive[.]" City of Baltimore v. Kelso Corp., 281 Md. 514, 519, 380 A.2d 216, 219 (1977). Thus, in Kelso Corp., id. at 519, 380 A.2d at 219, we held that, if the property owner could "show that the City through fraud manipulated the date of valuation to [the owner's] detriment, the court can remedy the injustice by ignoring the statutory date and allowing the jury to consider such factors as will allow the property owner to receive just compensation free of any effect of the fraudulent device."

In any event, in my view, the distinction between the purposes of condemnation and routine property assessment renders Hance and similar condemnation cases inapplicable. Condemnation occurs where the government takes a property through the power of eminent domain. See Mayor and City Council of Balt. City v. Valsamaki, 397 Md. 222, 241, 916 A.2d 324, 335 (2007) ("Condemnation is a function of the State's power of eminent domain[, which] is defined as the inherent power of a governmental entity to take privately owned property, esp[ecially] land, and convert it to public use, subject to reasonable compensation for the taking." (Citation, brackets, and internal quotation marks omitted)). The goal in a condemnation case, however, is to try to **give the property owner every opportunity to establish the value of the property that is most favorable to the property owner**, i.e., to establish "reasonable compensation for the taking." See id. at 243, 916 A.2d at 337 ("The Maryland Constitution provides that: 'The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid

or tendered to the party entitled to such compensation.'" (Citations omitted)). By contrast, in the context of property assessment, the purpose of property assessment is to assess property based on the fair market value of a property at a particular time. Indeed, SDAT or local authorities are to assess property taxes based on the "full cash value of property[,]" TP § 1-101(qq), which is the equivalent of the fair market value of the property. And, pursuant to TP § 8-104(b)(2)'s plain language, the fair market value is assessed as of the date of finality.

Significantly, unlike in condemnation cases, in the context of property assessment, TP § 8-102(a) and TP § 8-104(b)(2) expressly provide that the value of real property shall be the value as on the date of finality, which is January 1 of the relevant tax year. In other words, property assessment relies on the date of "finality," not the date of taking, the date of trial, or some other appropriate date. Through use of the term "date of finality," the General Assembly clearly expressed an intent that property owners have finality, *i.e.*, certainty about the date on which the value of the property would be determined. In other words, a property owner would know that, as of January 1 of the relevant tax year, his or her property has a specific value for tax assessment purposes. The property owner would then have the ability to rely on, or at least know, what the evidence would consist of, should the property owner choose to appeal the Board's decision or initial valuation.

By holding as the Majority does, however, property owners are placed in the difficult position of spinning the wheel and gambling on appeal, as property values could go up or down depending on "the sale of comparable properties occurring within a reasonable time after the date of finality[.]" Maj. Slip Op. at 18. In my view, the Majority's

holding will chill property owners' willingness and ability to appeal the Board's decision or initial valuation because the property owners will not know what the valuation is based on or what evidence will be used from after the date of finality. In some instances, a property owner will accept whatever the initial valuation is, rather than risk an appeal that could result in a higher valuation in light of the sale of comparable properties occurring after the date of finality. Presumably, it is left to a property owner's ability to read the Majority's opinion to assess the risk of an appeal. The Majority's holding places the onus on the property owner to locate sales of comparable properties "occurring reasonably soon after the date of finality[,]" and then accurately predict which sales of comparable properties SDAT or the Supervisor will utilize in reassessing the value of the property owner's property and which sales the Tax Court will find "relevant[.]" Maj. Slip Op. at 11. Additionally, what constitutes "occurring reasonably soon after the date of finality" is not defined by the Majority and would be subject to varying interpretations by SDAT and the Tax Court. This could not have been the General Assembly's intent in enacting TP § 8-104(b)(2).

Moreover, I want to emphasize that the Notice of Assessment, dated December 28, 2010, issued by the Supervisor of Assessments for Montgomery County to Petitioner stated that Petitioner's property would be assessed at a value of $2,130,000, which represented "the new market value effective January 1, 2011." The Notice of Assessment expressly stated that the "new market value is based upon market data available prior to this date." In other words, everything that was provided to Petitioner explicitly stated that the assessment of her property was based upon market data available prior to the date of

finality, *i.e.*, January 1, and that the assessment was effective as of the date of finality. There was no other notice that was provided to Petitioner that stated otherwise, and there was certainly nothing that was provided to Petitioner stating that the Supervisor could later justify the assessment using market data occurring after the date of finality.

In sum, I would hold that TP § 8-104(b)(2) does not permit the Tax Court to take into consideration sales of comparable properties that occur after the date of finality in determining the value of a property on the date of finality, as such a holding is contrary to TP § 8-104(b)(2)'s plain language, common sense, and the goal of giving property owners finality with respect to property assessments. Accordingly, for the above reasons, respectfully, I dissent.

Judge Battaglia has authorized me to state that she joins in this opinion.